# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

TYRONE GABB,

    Plaintiff,

v.

WEXFORD WEALTH SOURCE, INC, JOHN COE, and NURSE KIMMEL,

    Defendants.

Case No. 3:15-cv-01415-JPG-DGW

## MEMORANDUM AND ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

In this Eighth Amendment deliberate indifference case, Magistrate Judge Wilkerson recommends that the Court deny the defendants' motion for summary judgment. (Docs. 55, 58.) The Court has received the defendants' objection to the Magistrate Judge Wilkerson's Report and the plaintiff's response to that objection. (Docs. 64, 66.) For the following reasons, the Court **REJECTS** the Report and **GRANTS s**ummary judgment in favor of the defendants.

**I.    BACKGROUND**

Tyrone Gabb is an inmate at Lawrence Correctional Center ("Lawrence"). He claims to suffer from chronic back pain. (Compl. 5, ECF No. 1.) Specifically, Gabb says that he experiences pain (1) when standing for more than 15–20 minutes, and (2) when laying down. (Gabb Dep. 10:10–20, ECF No. 56-1.) To help alleviate the pain, he does body-weight exercises at the gym about once per week to stretch his back out. (*Id.* at 11:1–12:8.) Gabb also plays basketball in the prison gym on a regular basis, including the time periods at issue in this case. (*Id.* at 20:5–12; 25:22–26:9; 51:11–52:13.) Playing ball does not cause Gabb pain, apparently—only standing too long or laying down. (*Id.* at 61:12–62:15.)

1

Gabb first presented his lower back pain to defendant Dr. John Coe—a physician at Lawrenc—in January 2014, during a follow-up appointment for an unrelated issue. Dr. Coe ordered an x-ray of Gabb's back. (Coe Dep. at 61:10–62:19, ECF No. 56-2; Def.'s Mot. Summ. J., Ex. D, at 1, ECF No. 56-4.) At another follow-up appointment in February 2014, Gabb once again presented to Dr. Coe for a "multiplicity of complaints," including dizziness, scrotum pain, and mild back pain. (Coe Dep. at 62:20–64:20, ECF No. 56-2; Defs.' Mot. Summ. J., Ex. D, at 2, ECF No. 56-4.) Dr. Coe examined Gabb and reassured him that he had no significant issues. (Coe Dep. at 64:19–20, ECF No. 56-2.)

Gabb returned to Dr. Coe in September 2014 and complained about his back pain. (*Id.* at 65:1-66:23; Defs.' Mot. Summ. J., Ex. D, at 5, ECF No. 56-4.) Gabb explained that his back pain had been intermittent for years and stemmed from a childhood injury. Dr. Coe thoroughly examined Gabb's back once again, including a leg measurement evaluation, a straight leg-raising test, and a neurological examination of his legs. Dr. Coe then ordered another lumbar spine x-ray and prescribed two medications for Gabb: (1) Motrin, and (2) the muscle relaxer Robaxin. (*Id.*) When the x-ray results returned a few weeks later, Dr. Coe explained that it showed degenerative and arthritic changes in Gabb's back—so Dr. Coe formally diagnosed Gabb with chronic back pain, discontinued the Motrin, prescribed Naproxen (an ant-inflammatory drug used to reduce swelling and treat pain), and gave Gabb a back brace. (Coe Dep. at 67:13–68:17, ECF No. 56-2; Defs.' Mot. Summ. J., Ex. D, at 6, ECF No. 56-4.)

Later on, Gabb claimed that the meds and the back brace were not working, and Dr. Coe said that Gabb should put in for a nurse sick call and then go through the proper procedure to be seen by a practitioner. (Pl.'s Resp. Mot. Summ. J., Ex. C, at 5, ECF No. 57–3.) So in February 2015, Gabb presented to a physician's assistant for a follow-up appointment regarding his back

pain. (Defs.' Mot. Summ. J., Ex. D, at 7, ECF No. 56-4.) The assistant told Gabb to discontinue the Naproxen, take 650 mg of Tylenol four times per day for four months, and use an analgesic balm twice per day for three months.[1] (*Id.*)

A month later, Gabb went back to the infirmary because he had "severe" abdominal pain, which he believed was a result of taking too much Tylenol. (Gabb Dep. 13:13–21, ECF No. 56-1; Defs.' Mot. Summ. J., Ex. D, at 8–9, ECF No. 56-4.) Defendant Nurse Kimmel examined Gabb and told him to (1) lower the dose of Tylenol; (2) drink plenty of fluids and eat properly; (3) plan on attending his follow-up appointment with the physician's assistant in June; and (4) come back to the infirmary if his symptoms worsened. (*Id.;* Kimmel Dep. 49:14–21, ECF No. 56-3.) Nurse Kimmel admits that she did not refer Gabb to a doctor because (1) his symptoms did not constitute an emergency, and (2) Gabb already had another appointment scheduled with the physician's assistant. (Kimmel Dep. 42:6–8, 49:14–18, ECF No. 56-3.) She also admits that she may have told Gabb that if he did not like the medication he was taking, he could buy something else from the commissary. (*Id.* at 47:21–49:7.)

Gabb returned to the infirmary about two weeks later—albeit this time for issues with swallowing after another inmate elbowed him in the throat during a basketball match. (Defs.' Mot. Summ. J., Ex. D, at 10, ECF No. 56-4.) There is no mention of back pain on the medical record for that date. But a week after the basketball injury, Gabb returned to Nurse Kimmel at the infirmary and presented more abdominal pain, allegedly stemming from the Tylenol. (*Id.* at 12–13.) A conflict ensued. Nurse Kimmel tells one story: she says that Gabb refused to describe his pain other than it was due to Tylenol; he insisted on wanting a different medication; and he became argumentative and belligerent when he did not get what he wanted. (*Id.*; Kimmel Dep.

---

[1] An analgesic balm, also known as a "methyl salicylate topical," is "used for temporary relief of muscle or joint pain caused by strains, sprains, arthritis, bruising, or backaches." DRUGS.COM, *Analgesic Balm*, https://www.drugs.com/mtm/analgesic-balm.html (last accessed May 15, 2018).

57–67, ECF No. 56-3.) Nurse Kimmel advised Gabb that once again, there was no medical need to refer Gabb to a doctor because his case did not constitute an emergency, especially considering he was already scheduled for a follow-up appointment with the physician's assistant. All of these facts are supported by the medical records. Gabb, however, tells a different story: as soon as he walked into the room, Nurse Kimmel said she was not going to refer Gabb to the doctor because he was not actually in pain; she told Gabb he did not go to school for nursing; she cursed at Gabb and told him he was "bitching and whining"; and she told Gabb that he is wasting the taxpayers' money. (Coe Dep. at 15:15–16:20, ECF No. 56-2.) Gabb claims that he just sat there and took the abuse. (*Id.* at 16:18–20.)

A few weeks later at the end of April 2015, Gabb presented to the infirmary for abdominal pain once again, although to a different nurse. (Defs.' Mot. Summ. J., Ex. D, at 15, ECF No. 56-4.) The nurse noted that Gabb "appears pain free," but nevertheless "refused Motrin" in place of Tylenol. (*Id.*) Pursuant to protocol, however, the nurse was forced to refer Gabb to a doctor because he presented to the infirmary complaining of the same issue more than two times in one month. Gabb accordingly saw Dr. Coe again a week later, and Dr. Coe tightened Gabb's back support, refilled his prescription for Naproxen, and prescribed him Calcium 500 with Vitamin D supplements. (Pl.'s Resp. Mot. Summ. J., Ex. C, at 12, ECF No. 57–3.) Dr. Coe explained at his deposition that:

> I had previously noticed that particularly among black inmates who can't digest milk very well compared to whites and therefore don't drink it, and that's really the only source of Vitamin D. And I had previously done Vitamin D levels on people and found out that it was all -- just the amount of low Vitamin D problems. And if your Vitamin D is low, you're more likely to have muscle spasms and tightness…so I just gave him calcium with Vitamin D to supplement, as a supplement because he -- he's not a milk drinker.

(Coe Dep. at 67:13–68:17, ECF No. 56-2.)

In July 2015, Gabb returned to Dr. Coe once again. (Defs.' Mot. Summ. J., Ex. D, at 16, ECF No. 56-4.) Dr. Coe tightened the back support another time and described certain physical therapy exercises that Gabb could do in order to help stretch out his back. (*Id.*) In August 2015, Gabb presented to the physician's assistant yet again with complaints of abdominal pain—this time allegedly stemming from the Naproxen—and the physician's assistant ordered tests to rule out the chance that an abdominal infection had been causing the repeated symptoms. (*Id.* at 17.) The physician's assistant also prescribed Mobic, an anti-inflammatory that is known to be easier on the stomach than Naproxen.

A month later, Gabb saw Dr. Coe for his back pain again, and this time he said it was creeping up into his middle back as well. (*Id.* at 18.) Dr. Coe ordered an x-ray of the thoracic spine, discontinued the Mobic because it was allegedly not working, and prescribed the muscle relaxant Robaxin. When the x-ray results returned a few weeks later, they indicated that Gabb had mild degenerative disc disease, so Dr. Coe gave Gabb more of the muscle relaxant—yet only at night—to help him sleep. (*Id.* at 19.) The stories here diverge again: Gabb says that Dr. Coe told him that Wexford does not run a pain clinic, and even though there were outside treatments that could help, he would not refer him for those treatments because they were too expensive. (Gabb Dep. 32:8–15, ECF No. 56-1.) Dr. Coe tells a different story: he testified that he would not say something like that, but rather he did not refer Gabb to a specialist outside of Lawrence because "in [his] medical opinion, it was not necessary." (Coe. Dep. 88:13–20, ECF No. 56-2.) Meanwhile, Gabb continued to play basketball. On that note, Dr. Coe testified: "If [Gabb is] capable of running up and down a basketball court with whatever, you know, back troubles that he's having, you know, more power to him." (*Id.* at 88:7–10.)

In late 2015, Gabb brought this lawsuit against Dr. Coe and Nurse Kimmel, alleging that they were deliberately indifferent to his medical needs in violation of the Eighth Amendment. Gabb also named their employer—Wexford Health Sources, Inc.—as a defendant for promulgating and promoting policies that led to the alleged constitutional violation. After Magistrate Judge Wilkerson appointed Gabb counsel, the defendants moved for summary judgment. (Doc. 55.) Magistrate Judge Wilkerson later issued his Report recommending that the Court deny the motion for summary judgment. (Doc. 58.) The defendants have objected. (Doc. 64.)

## II. LEGAL STANDARDS

The Court may accept, reject, or modify—in whole or in part—the findings or recommendations of the magistrate judge in a report and recommendation. FED R. CIV. P. 72(b)(3). The Court must review *de novo* the portions of the report to which objections are made. *Id.* "If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999). Here, the defendants have objected to most of the Report, so the Court must conduct a *de novo* review.

### A. Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of

that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter summary judgment for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

B. **Eighth Amendment Deliberate Indifference**

The Eighth Amendment's prohibition on the unnecessary and wanton infliction of pain forbids deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). To prevail on such an Eighth Amendment claim, a prisoner must show (1) that he had an objectively serious medical need, and (2) that the official knew that the medical need was serious and presented a substantial risk of harm, but disregarded it. *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Johnson*, 444 F.3d at 584.

An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson*, 444 F.3d at 585. The prisoner must show that the defendant's conduct was intentional or criminally reckless; neither simple nor gross negligence is sufficient to establish deliberate indifference. *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015); *Johnson*, 444 F.3d at 585; *Salazar v. City of Chi.*, 940 F.2d 233, 238 (7th Cir. 1991). Deliberate indifference can arise in a few ways. For example, it can arise if a medical professional fails to provide prompt treatment for the need. *Chapman v. Keltner*, 241 F.3d 842, 845-46 (7th Cir. 2001) (citing *Estelle*, 429 U.S. at 104-05). It can also arise when a treatment decision was "blatantly inappropriate." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir.1996)). A "blatantly inappropriate" decision is one that is "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (internal citation omitted). This includes "doggedly persisting" in a course of treatment shown to be ineffective. *Greeno*, 414 F.3d at 656. A prison physician's failure to refer an inmate to a specialist does not constitute deliberate

indifference, however, as long as the choice (1) involved the exercise of medical discretion, and (2) was not blatantly inappropriate. *Pyles*, 771 at 411.

## III. ANALYSIS

As an initial matter, the parties do not object to the finding that Gabb suffered from an objectively serious medical need. Instead, the issue here is whether Dr. Coe and Nurse Kimmel were deliberately indifferent of that need. Regarding Dr. Coe, Magistrate Judge Wilkerson recommends that he was deliberately indifferent because he doggedly persisted in his ineffective treatment of Gabb and chose not to refer him to an outside specialist. Magistrate Judge Wilkerson also states that Nurse Kimmel was deliberately indifferent because she claimed to be ignorant of Gabb's allegations that he suffered from back pain; refused to provide any pain medication or a referral to a doctor; and told Gabb that he could buy something else from the commissary. The defendants object, arguing that Magistrate Judge Wilkerson failed to fully flesh out the facts of this case in his Report, among other things.

### A. Dr. Coe

Dr. Coe was not deliberately indifferent towards Gabb. Even construing the facts in the light most favorable to Gabb, his arguments still fail. The record in this case makes it abundantly clear that Dr. Coe properly exercised his medical discretion and provided a number of thorough exams and treatment to Gabb, including (1) numerous physical examinations of the back and abdomen for tenderness and swelling; (2) an x-ray of the lumbar spine, which returned negative for any issues; (3) a straight-leg raising test; (4) a neurological examination of the legs; (5) measurements of the legs; (6) a second lumbar spine x-ray; (7) a prescription for Motrin; (8) a prescription for the muscle relaxant Robaxin; (9) a back brace; (10) a prescription for Naproxen, an anti-inflammatory drug; (11) Calcium 500 + Vitamin D supplements to help with back

spasms; (12) instructions on certain physical therapy exercises to help stretch out the back; (13) a refill for Naproxen; (14) several adjustments to the back brace; (15) a thoracic spine x-ray; and (16) a prescription for another muscle relaxant, Robaxin. This is not "dogged persistence," but rather a thorough exercise of medical discretion via numerous treatment strategies.

And the fact that Dr. Coe did not refer Gabb to a pain specialist does not change anything. *Pyles* is precisely on point here: that case also dealt with a prisoner with chronic back pain where the prisoner brought an Eighth Amendment deliberate indifference claim against the prison physician for not referring the prisoner to a specialist. 771 F.3d at 405–07. *And* that prisoner argued that the physician persisted in a course of treatment that was otherwise ineffective, just like Gabb does here. *Id.* at 407–08. The Seventh Circuit affirmed the district court's granting of summary judgment for the physician, however, stating:

> **Mr. Pyles suffers from back pain, a common ailment.** On this record a jury could not conclude that Dr. Fahim inflicted cruel and unusual punishment on Mr. Pyles by refusing to refer him to a specialist. We do not mean to suggest that back pain never requires treatment by a specialist, but only that it is not warranted under these circumstances.
>
> We agree with the district court that the undisputed evidence establishes that Dr. Fahim was not deliberately indifferent to Mr. Pyles's pain. **When Mr. Pyles complained that his medications were not helping, Dr. Fahim responded by prescribing new medications or changing the dosages.** Mr. Pyles may have wanted different treatment, but his disagreement with Dr. Fahim does not allow him to prevail on his Eighth Amendment claim. As far as this record shows, Dr. Fahim's choice of treatment was not blatantly inappropriate.

*Pyles*, 771 F.3d at 412 (emphasis added).

And factually, this case is even stronger for Dr. Coe than the facts in *Pyles* were to that defendant physician. Gabb played basketball in the prison yard on a regular basis. (Coe Dep. at 87:16–22, ECF No. 56-2.) These included tough, physical games where Gabb received an elbow to the throat at least once. (Defs.' Mot. Summ. J., Ex. D, at 10, ECF No. 56-4.) This fact will of

course play into a doctor's exercise of medical discretion as to whether that inmate should see an outside specialist for back pain. Accordingly, Dr. Coe did not have the requisite mental state for deliberate indifference—a standard which requires intent or criminal recklessness, not simple negligence. *Burton*, 805 F.3d at 784. And even if Dr. Coe told Gabb that Wexford does not run a pain clinic and that Wexford would not pay for those outside clinics, it does not matter; all of the evidence in this case—the exams, the x-rays, the back brace, the numerous painkillers and muscle relaxers, the physical therapy routines, and the observation that Gabb was nevertheless healthy enough to engage in physical games of basketball—indicates that Dr. Coe's medical treatment of Gabb involved the exercise of medical discretion and was not "blatantly inappropriate." *Pyles*, 771 at 411. The Court will grant summary judgment for Dr. Coe.

### B. Nurse Kimmel

Neither was Nurse Kimmel deliberately indifferent. Magistrate Judge Wilkerson came to the opposite conclusion, arguing that (1) Nurse Kimmel could not or should not have been unaware of Gabb's back pain given his medical records and his previous encouters; (2) Nurse Kimmel "Nurse Kimmel told Gabb if he did not like the prescribed medication he could purchase something else through the commissary"; and (3) "Nurse Kimmel refused to refer Gabb to a doctor despite his repeated requests."

The Report, however, failed to take into consideration that Nurse Kimmel *did* provide treatment to Gabb during both visits. During her first encounter with Gabb, Nurse Kimmel examined Gabb and told him to (1) lower the dose of Tylenol; (2) drink plenty of fluids and eat properly; (3) plan on attending his follow-up appointment with the physician's assistant in June; and (4) come back to the infirmary if his symptoms worsened. (Defs.' Mot. Summ. J., Ex. D, at 8–9, ECF No. 56-4; Kimmel Dep. 49:14–21, ECF No. 56-3.) The medical records indicate that,

just like with Dr. Coe, Nurse Kimmel made a medical judgment that Gabb's symptoms were not serious enough to warrant a further referral. And the fact that Nurse Kimmel told Gabb he could buy something else through the commissary is irrelevant: it is well established that prisoners do not enjoy an Eighth Amendment right to disagree with a medical professional and choose their own treatment plan—which is exactly what Gabb tried to do here, considering his encounters with Nurse Kimmel centered on him wanting something besides Tylenol. *See, e.g., Ciarpaglini v. Saini,* 352 F.3d 328, 331 (7th Cir. 2003); *Pyles*, 771 F.3d at 409; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Thompson v. Godinez*, 561 F. App'x 515, 518 (7th Cir. 2014); *Johnson v. Loftin*, 464 F. App'x 530, 533 (7th Cir. 2012).

Nurse Kimmel's second meeting with Gabb does not change anything. There, Gabb said that Nurse Kimmel belittled him and told him that he was not actually in pain. Nurse Kimmel, on the other hand, testified that Gabb was belligerent, would not describe his pain, and demanded another medication besides Tylenol. But just like the last encounter, the medical records indicate that Nurse Kimmel explained that (1) this was not an emergency that required a doctor; (2) told Gabb that he had an upcoming appointment scheduled with the physician's assistant; and (3) advised him to continue drinking plenty of water. (Defs.' Mot. Summ. J., Ex. D, at 12–13, ECF No. 56-4.) Interestingly enough, Gabb does not challenge the fact that Nurse Kimmel provided this treatment. Rather, Gabb summed up his argument against Nurse Kimmel by stating the following:

> For no valid purpose, [Nurse Kimmel] appointed herself as gatekeeper to deny Plaintiff an opportunity to obtain medical treatment for his pain. No extended discussion is necessary to show that Plaintiff's testimony about Kimmel's conduct toward him and verbal abuse surely is sufficient to demonstrate further her deliberate indifference toward him and his medical needs.

(Pl.'s Resp. Mot. Summ. J., at 11, ECF No. 57)

That final quote demonstrates why Gabb is wrong. Nurses *are* gatekeepers at the infirmary: they examine the patients, provide treatment, and determine whether a referral to a doctor is necessary. Nurse Kimmel did exactly that. The record is clear that she examined Gabb, pursued a particular course of treatment, and determined that a visit to a doctor was not necessary. The Court "will not interfere with a [medical professional's] decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409. And the Court will not contravene rock-solid Seventh Circuit precedent and hold that a prisoner has a constitutional right to demand a particular treatment plan, especially when the medical professionals in this case provided Gabb with over a dozen forms of treatment. And even if Nurse Kimmel did curse at and belittle Gabb during their second encounter, the Constitution does not mandate that prison officials must "address prisoners in a civil tone using polite language." *Antoine v. Uchtman*, 275 F. App'x 539, 541 (7th Cir. 2008). While this Court does not condone cursing at a prisoner (or anyone, for that matter), doing so simply does not amount to a violation of the Eighth Amendment. So the Court will also grant summary judgment in favor of Nurse Kimmel.

As a final matter, the Court must grant summary judgment in favor of Wexford. Gabb's theory was that he could hold Wexford liable for the promulgation of a policy or practice that caused the underlying constitutional violation. *See Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015). But since there was no constitutional violation here, Wexford is not liable for anything.

## CONCLUSION

For the foregoing reasons, the Court:

- **REJECTS** the Report (Doc. 58);

- **GRANTS** the defendants' motion for summary judgment (Doc. 55);

- **DISMISSES** this case **WITH PREJUDICE**; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  MAY 22, 2018**

<u>s/ *J. Phil Gilbert*</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**